WILLIAM G. HARRISON *v.* WILLIAM BISLAND.

The conventional subrogation in favor of a third person, from whom the creditor has received payment, must be expressed, and made at the time of the payment.  C. C. 2156.   Facts going to show the unexecuted intention of the parties, will not suffice.

One who binds himself unconditionally, or furnishes money, for the payment of a debt, does not thereby entitle himself to the right of the creditor who is thus paid. A legal subrogation exists in favor, not of all who pay a debt, but only of those who, being bound for it, discharge it.

APPEAL from the Commercial Court of New Orleans, *Watts*, J. *Johnson* and *L. Janin*, for the appellant.   The plaintiff's assignor was subrogated to the rights of the Carrolton Bank, under art. 2156, § 1.   A verbal agreement to subrogate was sufficient, and parol evidence admissible to prove it.   12 Duranton, No. 117, p. 184.   Boilleux, Comm. de Code Civil, vol. 2, p. 639.   Dalloz, Dictionaire Général de Jurisprudence, vol. 4, p. 403, Nos. 18, 19, 20.   Plaintiff was *legally* subrogated under § 3 of art. 2156. The evidence shows, that the drafts executed by John C. Harrison were merely collateral security for the payment of the debt due by Shields, and the defendant, to the Bank.   J. C. Harrison was not indebted to them, and bound himself as their security. See *Baldwin* v. *Thompson*, 6 La. 478.   *Cox* v. *Baldwin*, 1 La. 405.

*R. N. Ogden* and *A. N. Ogden*, for the defendant.

SIMON, J.   This is an attempt to make the defendant responsible for, and to compel him to pay, the sum of $17,301 66, being the amount of two promissory notes subscribed, *in solido*, by Thomas R. Shields and the defendant, payable to the order of John Routh, and endorsed by the latter.   The amount claimed is subject, however, to certain credits, more particularly stated in the petition.

The facts and circumstances of the case, as shown by the evidence, are these : Thomas R. Shields was, in the beginning of the year, 1839, indebted to the commercial house of Bullitt, Shipp & Co., in a large sum of money.   In settlement of this debt, he and the defendant executed three promissory notes, *in solido*, to

the order of John Routh, which were delivered to Bullitt, Shipp & Co., who caused them to be discounted in the Carrolton Bank. The first of these notes was for the sum of $8,246 23, payable 1st of December, 1839 ; the second was for $9,055 21, payable 1st of December, 1840 ; and the third was for $9,864, payable 1st of December, 1841.

On the 3d of April, 1841, after maturity of the two first notes, (the third one we have nothing to do with,) two partial payments having been made thereon previously, Shields made a settlement with the Carrolton Bank, and procured the three acceptances of John C. Harrison, then his commission merchant, to wit : one for $4,222 74, due 1st of November, 1841 ; one for $4,246 29, due 1st of December, 1841 ; and one for $4,270 53, due 1st of January, 1842, which three drafts, all dated the 3d of April, 1841, were drawn for the precise amount due to the Carrolton Bank on the two first notes, were accepted by John C. Harrison, and were received by said Bank, under the following receipt given by the Cashier :

" 3d of April, 1841.—*Received, the acceptance of John C. Harrison of the three above mentioned drafts, which, when paid, will be in full of the above debt due by T. R. Shields and W. Bisland ; but they are in no wise to novate the original notes now under protest, drawn by T. R. Shields and W. Bisland, and endorsed by John Routh, which are retained by the Bank, and will be sued upon in case either said acceptances be not paid.*

" John Nicholson, *Cash'r.*"

The three acceptances were duly paid by John C. Harrison, and the two protested joint and several notes of Shields and Bisland were delivered up by the Bank to Harrison, who transferred them subsequently to the plaintiff, who claims the payment of those notes from Bisland, under the allegations that, on the payment of the drafts by John C. Harrison, the notes were delivered to him for the express purpose that he, John C. Harrison, might be subrogated to the rights of the Bank, and should enjoy the same recourse as the Bank had enjoyed, upon all the parties to said notes, until their final payment.

This pretension is resisted by the defendant, on the ground, that the notes sued on were by him executed as joint and several

drawer with T. R. Shields for a debt *due individually* by said Shields, and solely for said Shields' benefit and accommodation; and that, after said notes had become due, said Shields procured the acceptances of his factor, John C. Harrison, for the purpose of taking them up, which acceptances were paid at maturity, and the notes thereby extinguished; and that the plaintiff took the notes from John C. Harrison, who, as the factor of Shields, had paid them, well knowing that said notes had been paid, and the debt thereby created, entirely extinguished.

Judgment having been rendered below in favor of the defendant, the plaintiff appealed.

From the testimony of the President, Cashier, and Notary of the Carrolton Bank, it appears, that at the time when the settlement was made and the acceptances delivered, it was understood that if the drafts were paid, the notes would be given up to Harrison; that after the drafts were paid, Harrison required the notes to be given up to him, and asked for a subrogation; that this was agreed to by the President, but it being considered unnecessary by the Notary, no subrogation was executed. None of the witnesses are able to fix any time at which the subrogation was applied for, and consented to; one of them only presumes, that it was applied for before the maturity of the drafts. The President of the Bank thinks that Harrison called on him for the subrogation before he paid the drafts; but they all agree that the Bank was, at all times, willing to give an act of subrogation, and that Harrison was informed that this was unnecessary. The Cashier states, that at the time of the agreement, nothing was said about subrogation, but that the Bank considered that, on payment of the drafts, Harrison was entitled to the notes. It was his opinion that Harrison, on payment of the drafts, would have all the rights of the Bank, and that no act of subrogation was necessary for this.

The plaintiff rests his right to recover, not only upon the conventional subrogation alleged in his petition, but also upon the legal subrogation to which, he contends, he is entitled as resulting from the nature of the obligation by him contracted *for the defendant*, and *his co-debtor in solido*.

1. As to the conventional subrogation: the facts from which it is attempted to be established, have already been stated in sub-

Harrison v. Bisland.

stance, and it does not appear to us that any thing has been shown to bring it within the meaning of art. 2156 of the Civil Code, the first paragraph of which provides that, " the subrogation is conventional, when the creditor, receiving his payment from a third person, subrogates him in his rights, actions, privileges and mortgages against the debtor. This subrogation *must be expressed*, and *made at the same time as the payment.*" Now, although it seems to have been the idea of the parties that John C. Harrison was, after payment of the drafts, entitled to the possession of the two notes, was it really and expressly agreed between them, that said Harrison should be subrogated to the rights of the Bank? Was it so expressly understood when the payment was made? The word " subrogation," appears to be used by the witnesses in reference to the request made by Harrison, that the notes should be given up to him after payment: for this, an act was thought unnecessary; because, as the notary understood, the notes were not mortgage notes, and their possession was sufficient: but to say, that this delivery of the notes was made in view of an express subrogation agreed on between the parties, would be supplying this legal requisite, or condition, by facts going merely to show the unexecuted intention of the parties, and giving to inferences, drawn from their acts and conversations, the effect of what the law requires to be an express stipulation. " *La subrogation est expresse, lorsqu' elle résulte clairement et sans équivoque des termes de l'acte : dans le doute, la dette seroit réputée éteinte.*" Favard de Langdale, V. Subrogation, § 1. No. 6. Touillier, V. 7, No. 117, says : *Il existe une différence bien remarquable entre la formule par laquelle le créancier, en recevant ce qui lui est dû, réserve les droits ou le recours de celui qui paye, et celle où il le subroge dans ses droits, ou les lui cède. Dans le premier cas, nulle convention entre celui qui paye, et le créancier qui reçoit. La créance est eteinte. La subrogation, au contraire, est une vente que le créancier fait de la créance.* See also Duranton, V. 12, Nos. 116 117, 118. Here, it seems to us, that the parties never had in view any other object but to preserve the rights, or the recourse, which they conceived Harrison had a right to exercise by virtue of the notes which were to be given up to him ; but, there was nothing expressly agreed between them as to the rights of the

Bank, which were a matter entirely distinct, and which were never made the subject of a conventional subrogation. Again, to give this effect to their act, it must be expressly stipulated.

It has been said, that the conventional subrogation contended for, results from the terms of the receipt. We think not. This receipt was so worded as to prevent a novation as between the Bank, and the debtors ; but there is clearly nothing in it which can be construed as intimating, that a subrogation is to follow in favor of the acceptor of the drafts. The notes are to be retained by the Bank to be sued upon, in case the acceptances are not paid. This receipt would, on the contrary, exclude the idea of there being any subrogation at the time that the acceptances were delivered, since all the rights of the Bank to the notes were carefully preserved until the full and complete payment of the drafts, and were to be exercised for the benefit of the Bank. Surely, it will not be pretended that the Bank could not retain the possession of the notes, until all the drafts were discharged.

But, even supposing that the plaintiff has succeeded in showing an express agreement to subrogate, has he satisfied us that it was made at the same time as the payment? On this fact, the evidence leaves us entirely in the dark. Neither of the witnesses is able to fix any period at which the conversations took place. Was it at the time of the acceptances ? Was it before, or at the time that the drafts were paid ? When was it ? . These questions are unanswered by the record, except that the witnesses presume that it must have been before the maturity of the drafts. We have already shown that, from the receipt itself, no subrogation could exist before the payment of the drafts, for the rights of the Bank to the notes were, according to the receipt, to remain unimpaired and unaffected, until the acceptances were completely paid ; and it is obvious, that no valid subrogation could have been made at any other time, but when the drafts were paid. "*Le moindre intervalle entre le payement et la subrogation la rend nulle et sans effet ; car le créancier ne peut plus céder des droits qui n'existent plus.* Touillier, v. 7, No. 116. Thus, it was the duty of the plaintiff to show, that the subrogation took place, in the words of the law, "at the same time as the payment," of the drafts. Under the receipt, it could not exist before ; and under the requi-

site of the law, it could not be made after. We think the plaintiff has failed in his attempt to establish a conventional subrogation.

2. As to legal subrogation : this question does not present much difficulty. The notes sued on were due at the time that the acceptances were furnished, and John C. Harrison was not bound in any manner, to pay the debt of Shields & Bisland. By accepting the drafts, he furnished to the debtors of those notes, the means of satisfying their obligation, as instead of loaning thém money for that purpose, he obligated himself absolutely to pay the amount due, at certain fixed periods. He did not bind himself as their security, for, his obligation which was an absolute one, was not subsidiary ; and being distinct and independent from the original notes, did not depend upon the non-payment of the principal debt. So it was taken by the Bank ; and John C. Harrison became their absolute debtor, though on the notes intended to be paid, he was not bound with or for the original debtors. Now, art. 2157 of the Civil Code, says, that " subrogation takes place of right, for the benefit of him, who, being bound with others or for others, for the payment of the debt, had an interest in discharging it." What interest had John C. Harrison in discharging the notes sued on ? It is true he obligated himself subsequently to pay them, but this was not a consequence of the original obligation which he had nothing to do with ; nor was he, under any previous promise, bound to satisfy it. We cannot look upon his acceptances, by him paid at maturity, as giving him any more right than if, instead of accepting drafts, he had furnished the money for the payment of the notes ; and in the case of *Nolté* v. *His Creditors*, 7 Mart. N. S. 603, this court held, that, " there is no law which gives to the party who furnishes money for the payment of a debt, the rights of the creditor who is thus paid. The legal claim alone belongs, not to all who pay a debt, but only to him, who being bound for it, discharges it." Again, John C. Harrison was not bound to pay the notes sued on, and had no interest in discharging them.

Upon the whole, we conclude that the plaintiff is not entitled to recover. The evidence shows, that the debt was originally contracted for the sole benefit of Shields ; that Bisland, though con

nected with him in the ownership and cultivation of a plantation, signed the notes as his partner's surety ; that John C. Harrison was Shields' factor, and kept an account current with him at the time that the acceptances were furnished ; indeed, it has been shown, that the amounts of the drafts, or the acceptances, were immediately charged to Shields in his separate account current with Harrison. This charge was made on the 30th of April, 1841, and is included in the account rendered on the 30th of June, 1841, long before any of the drafts became due. In the account rendered of the same date to Bisland & Shields, a balance is shown to be due by Harrison to them of $5,915 73 ; and on the 31st of December, 1841, at the time that the last of Harrison's acceptances became due, he rendered an account to Bisland & Shields, showing a balance in his hands in their favor of $8,955. On the same day, another account was by him rendered to Shields individually, in which he credits his individual account, in which he is charged with the acceptances in favor of the Carrolton Bank, with a balance of $8,869 78, which he says is transferred to Shields' credit from the account of Bisland & Shields, by order of Shields himself. All these accounts and transactions show clearly that John C. Harrison never intended to look to the defendant for the payment or reimbursement of the drafts ; that Shields was the only person at whose request and for whose benefit the acceptances were furnished ; and that in the transaction between Harrison and Shields, which was one made in the course of their ordinary dealings, Bisland was entirely out of the question. Shields alone obtained the acceptances from Harrison ; Shields alone was charged with them ; and to Shields alone should the plaintiff look for the reimbursement of John C. Harrison's advances. The debt due by Shields & Bisland, *in solido*, to the Carrolton Bank, was discharged and extinguished by the payment of Harrison's acceptances, as effectually as if Shields had borrowed money for that purpose ; and we concur with the Judge, *a quo*, in the opinion, that to allow the present action, would be to authorize factors to keep alive the liability of endorsers and others, whenever they paid the notes or bills of their constituents, by their orders, after protest. This cannot be permitted.

*Judgment affirmed.*